IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LELA MARIAMA B. TRAMEL, #260392,)
)
Plaintiff, )
)
v. ) CASE NO. 2:12-CV-12-WKW
) [WO]
)
OFFICER BRIAN WILSON, *et al.*, )
)
Defendants. )

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I. INTRODUCTION**

This 42 U.S.C. § 1983 action is before the court on a complaint filed by Lela Mariama B. Tramel ("Tramel"), an indigent state inmate, challenging actions taken against her at the Tutwiler Prison for Women ("Tutwiler") from January 8, 2011 until August 1, 2011. *Complaint - Doc. No. 1* at 2. Tramel names Brian Wilson, Samuel Foster and Karla Jones, correctional officials employed at Tutwiler during the time relevant to the complaint, CMS and Corizon, the former and current medical care provider for the state prison system, and physicians Emmett Roe and Hugh Hood as defendants in this cause of action. Tramel seeks monetary damages and injunctive relief for the alleged violations of her constitutional rights.

The defendants filed special reports and relevant supporting evidentiary materials, including affidavits and medical records, addressing Tramel's claims for relief. Pursuant

to the orders entered in this case, the court deems it appropriate to construe the aforementioned reports as motions for summary judgment. *Order of March 26, 2013 - Doc. No. 107*. Thus, this case is now pending on the defendants' motions for summary judgment. Upon consideration of these motions, the evidentiary materials filed in support thereof, the sworn complaint and the plaintiff's responses to the reports, including sworn statements, the court concludes that: (i) Defendant Wilson is due to be dismissed from this case because service was not perfected within the requisite period of time; (ii) The claims against Dr. Roe are subject to dismissal as they do not implicate a constitutional violation; (iii) The motion for summary judgment filed by defendants CMS, Corizon and Hood is due to be granted; (iv) Defendant Jones is entitled to summary judgment on the excessive force claim presented against her; and (v) Defendant Foster's motion for summary judgment as to the excessive force claim lodged against him is due to be granted in part and denied in part.

## II. SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law.”).[1] The party moving for summary judgment “always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [- now dispute -] of material fact.” *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (moving party has initial burden of showing there is no genuine dispute of material fact for trial). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present appropriate evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-24.

Defendants Foster, Jones, CMS, Corizon and Hood assert they have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact with respect to the claims presented by the plaintiff. Based on the foregoing, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to her case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) (“If a party fails

[1] Effective December 1, 2010, Rule 56 was “revised to improve the procedures for presenting and deciding summary-judgment motions.” Fed. R. Civ. P. 56 Advisory Committee Notes. Under this revision, “[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine ‘issue’ becomes genuine ‘dispute.’ ‘Dispute’ better reflects the focus of a summary-judgment determination.” *Id*. “‘Shall’ is also restored to express the direction to grant summary judgment.” *Id*. Despite these stylistic changes, the substance of Rule 56 remains the same and, therefore, all cases citing prior versions of the rule remain equally applicable to the current rule.

to properly support an assertion of fact or fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, relevant documents or other materials] the court may . . . grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it."); *Jeffery*, 64 F.3d at 593-94 (internal quotation marks omitted) (Once the moving party meets its burden, "the non-moving party must then go beyond the pleadings, and by its own affidavits [or sworn statements], or by depositions, answers to interrogatories, and admissions on file," demonstrate that there is a genuine dispute of material fact.). This court will also consider "specific facts" pled in a plaintiff's sworn complaint when considering his opposition to summary judgment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007).

In civil actions filed by inmates, federal courts

> must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities [and medical personnel]. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citation omitted). Consequently, to

survive the defendants' properly supported motions for summary judgment, Caldwell is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claims of constitutional violations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Fed. R. Civ. P. 56(e). "If the evidence [on which the nonmoving party relies] is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson*, 477 U.S. at 249-50. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1576-77 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 250). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (A plaintiff's "conclusory assertions . . . , in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond her "own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("Mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment . . . ."); *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value."). Hence, when a plaintiff fails to set forth specific facts

supported by requisite evidence sufficient to establish the existence of an element essential to her case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Sw. Forest Indus., Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate.); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (summary judgment appropriate where no genuine dispute of material fact exists). At the summary judgment stage, this court must "consider all evidence in the record . . . [including] pleadings, depositions, interrogatories, affidavits, etc. -- and can only grant summary judgment if everything in the record demonstrates that no genuine [dispute] of material fact exists." *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Sec'y of the Dep't of Children and Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary

judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show no genuine dispute as to a requisite material fact); *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (To establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in her favor.).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard*, 548 U.S. at 525; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir.

1990). Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. The court has undertaken a thorough and exhaustive review of all the evidence contained in the record. In this case, Tramel, through the submission of her sworn complaint and responsive statements has demonstrated a genuine dispute of material fact in order to preclude entry of summary judgment on her excessive force claim against defendant Foster. Defendants Jones, CMS, Corizon and Hood, however, are entitled to summary judgment on Tramel's remaining claims for relief. Moreover, dismissal of the claims against Brian Wilson are appropriate as service could not be perfected on this individual and the complaint likewise fails to state a basis for relief against defendant Roe.

## III. DISCUSSION[2]

In her complaint, Tramel alleges that Officer Samuel Foster subjected her to excessive force on the morning of January 8, 2011, by forcefully removing her from day room area of her assigned dorm. *Complaint - Doc. No. 1* at 3. Tramel further asserts that Foster, without justification, subsequently slammed her against the side of the building and choked her by placing his forearm against her throat. *Id*. At this time, Officer Wilson approached Tramel and grabbed her by the right wrist at which time both officers turned

[2]The court limits its review to the allegations set forth in the complaint filed by Tramel. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment."); *Ganstine v. Sec'y, Fla. Dep't of Corrs.*, 502 F. App'x 905, 909-10 (11th Cir. 2012) (plaintiff may not amend complaint at the summary judgment stage by raising a new claim or presenting a new basis for a pending claim); *Chavis v. Clayton Cnty. Sch. Dist.*, 300 F.3d 1288, 1291 n. 4 (11th Cir. 2002) (district court correctly refused to address a new theory raised during summary judgment because the plaintiff had not properly amended the complaint).

Tramel around pinning her "against the wall face first . . . . Wilson held my arm straight and applied pressure to my elbow area until it popped. Then he eased pressure but did not discontinue it until Lt. [Ferrell] arrived." *Id*. Lt. Ferrell placed Tramel in handcuffs and Foster and Wilson escorted her to the administrative building. *Memorandum in Opposition to Special Report of Correctional Defendants - Doc. No. 36* at 8. Tramel and Foster were interviewed by Lt. Ferrell. *Id*. at 8-9. After speaking with Tramel, Lt. Ferrell ordered that the handcuffs be removed from Tramel and that she be escorted to the health care unit for an examination. *Id*. at 9.

Tramel also asserts that on January 21, 2011 defendant Jones, the assistant warden at Tutwiler, "snatched on [her] left arm" in an attempt to have Tramel respond to an order. *Complaint - Doc. No. 1* at 5; *Memorandum in Opposition to Special Report of Correctional Defendants - Doc. No. 36* at 12. Finally, Tramel complains that health care personnel failed to provide adequate medical treatment for the injury suffered to her right elbow. *Complaint - Doc. No. 1* at 3-5. In support of this claim, Tramel alleges she received "easier and less efficacious means of treatment than was appropriate." *Id*. at 4.

**A. Dismissal for Lack of Service**

Tramel names Brian Wilson as a defendant in this cause of action. The court attempted service on Wilson at various addresses provided by Tramel. Service, however, could not be perfected on this individual at any of these addresses. Thus, in accordance with *Richardson v. Johnson*, 598 F.3d 734, 740 (11th Cir. 2010), the court ordered that

"the United States Marshal for the Middle District of Alabama shall make a reasonable effort to locate Brian Wilson, a former employee of the Alabama Department of Corrections at the Julia Tutwiler Prison for Women whose last known address was in Wetumpka, Alabama." *Order of February 13, 2012 - Doc. No. 26*. Despite extensive efforts by the United States Marshal, the Marshal was unable to perfect service on Brian Wilson.

Under Rule 4(m) of the Federal Rules of Civil Procedure, "[i]f a defendant is not served within 120 days after the complaint is filed, the court - . . . on its own after notice to the plaintiff - must dismiss the action without prejudice against that defendant. . . . But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period." When a plaintiff fails to perfect service of process within the 120-day period, dismissal is mandatory unless the plaintiff can show good cause or establish sufficient grounds for an extension of this time period. *Schnabel v. Wells*, 922 F.2d 726, 728 (11th Cir. 1991) (interpreting the 120-day period as it appeared in Rule 4(j), *Federal Rules of Civil Procedure*, the predecessor to Rule 4(m), *Federal Rules of Civil Procedure*); *In re Cooper*, 971 F.2d 640, 641 (11th Cir. 1992) (Absent a showing of good cause, a district court has no discretion to salvage an action in the event of a violation of Rule 4(m)); *Horenkamp v. Van Winkle & Co.*, 402 F.3d 1129, 1132 (11th Cir. 2005) (A court may grant an extension to serve process for either "good cause" or another sufficient ground). "[C]ourts have found 'good cause' under Rule 4[m] only when some outside

factor such as reliance on faulty advice, rather than inadvertence or negligence, prevented service." *Prisco v. Frank*, 929 F.2d 603, 604 (11th Cir. 1991).

The 120-period for service expired in May of 2012. Tramel, however, was allowed extensions until September 18, 2012 to provide a correct address for Wilson so that service might be perfected Brian Wilson. The court provided Tramel notice of the lack of service on Brian Wilson and the impending requisite dismissal of Wilson from this cause of action if service could not be perfected on this individual. *Order of August 21, 2012 - Doc. No. 62*. Consequently, Tramel's claims against Brian Wilson are subject to dismissal without prejudice as service has not been perfected on Wilson within the time allowed by the court.

**B. Absolute Immunity - Defendants Jones and Foster**

To the extent Tramel sues defendants Jones and Foster in their official capacities, they are immune from monetary damages. Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985).

> A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S. Ct. 900, 908, 79 L. Ed. 2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S. Ct. 1114, 1125, 134 L. Ed. 2d 252 (1996). Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity. Therefore, Alabama state officials are immune from claims brought against them in their official capacities.

*Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing, the defendants Jones and Foster are state actors entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities. *Lancaster*, 116 F.3d at 1429; *Jackson v. Ga. Dep't of Transp.*, 16 F.3d 1573, 1575 (11th Cir. 1994); *Parker v. Williams*, 862 F.2d 1471 (11th Cir. 1989).

**C. Medical Treatment - Defendants CMS, Corizon, Hood and Roe**

Tramel asserts that, after suffering an injury to her right elbow in January of 2011, she received inadequate medical treatment for this injury from defendants CMS, Corizon, Hood and Roe. *Complaint - Doc. No. 1* at 3-5. Specifically, Tramel alleges that from the time she suffered the injury and for several months thereafter health care personnel provided minimal treatment for the injury and refused to refer her to a free world orthopedic surgeon for evaluation.

To prevail on a claim concerning an alleged denial of adequate medical treatment, an inmate must, at a minimum, show that the defendants acted with deliberate indifference to her serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir.1986). Specifically, medical personnel may not subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical

needs." *Estelle*, 429 U.S. at 106, 97 S. Ct. at 292; *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995) (citation and internal quotations omitted) (As directed by *Estelle*, a plaintiff must establish "not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat or a delay in [the acknowledged necessary] treatment.").

> That medical malpractice-negligence by a physician-is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle v. Gamble*, 429 U.S. 97, 105-07, 97 S. Ct. 285, 292, 50 L. Ed. 2d 251 (1976); *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995). Instead, something more must be shown. Evidence must support a conclusion that a prison physician's harmful acts were intentional or reckless. *See Farmer v. Brennan*, 511 U.S. 825, 833-38, 114 S. Ct. 1970, 1977-79, 128 L. Ed. 2d 811 (1994); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams*, 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. Dekalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1191 n.28 (11th Cir. 1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to properly establish "deliberate indifference to [a] serious medical need. . . , Plaintiff[] must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009). When seeking

relief based on deliberate indifference, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk to the prisoner). Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference). Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

> In articulating the scope of inmates' right to be free from deliberate indifference, . . . the Supreme Court has . . . emphasized that not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle*, 429 U.S. at 105, 97 S. Ct. at 291; *Mandel*, 888 F.2d at 787. Medical treatment violates the eighth amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers*, 792 F.2d at 1058 (citation omitted). Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle*, 429 U.S. at 106, 97 S. Ct. at 292 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.");

> *Mandel*, 888 F.2d at 787-88 (mere negligence or medical malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop*, 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference). Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment. *See Waldrop*, 871 F.2d at 1033 (citing *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *Taylor*, 221 F.3d at 1258 (citation and internal quotations omitted) (To show deliberate indifference to a serious medical need, a plaintiff must demonstrate that the defendants' response to the need was more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law."). Moreover, "as *Estelle* teaches, whether government actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545; *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A difference of opinion as to how a condition should be treated does not give rise to a constitutional violation."); *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) (mere fact inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (prison medical personnel do not violate the Eighth Amendment simply because their opinions concerning medical treatment conflict with that of other medical professionals or the inmate-patient). Self-serving statements by a plaintiff do not create a question of fact in

the face of contradictory, contemporaneously created medical records. *See Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990). In addition to the above described requisite elements, when an inmate's deliberate indifference claim alleges a delay in treatment, this court must also consider "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1327 (11th Cir. 2007).

After the altercation with correctional officers on January 8, 2011, Tramel was escorted to the health care unit for examination. The attending nurse observed "only superficial injuries. . . . No acute distress." *Exhibit A to the Special Report of Defendants CMS, Corizon and Hood (Medical Records of Tramel) - Doc. No. 24-2* at 42. The injuries noted by the nurse included "swelling to [right] elbow area outer aspects. Also . . . sm[all] contusion to [right] great toe and sm[all] laceration to [left] chin area." *Id*. During this examination, the nurse determined that Tramel was "able to raise [right] arm, difficult to bend [right] elbow area [without complaining of] pain during movement of [right] elbow area." *Id*. at 37. The assessment from the examination indicated "[a]n alteration in musculoskeletal system [related to] possible sprain of [right] elbow area and also . . . contusion to [right] great toe and sm[all] laceration to [left] chin area." *Id*. at 42. The nurse applied an ace bandage to Tramel's right arm and provided "an ice pack [for use by Tramel] to decrease swelling." *Id.* Tramel refused pain medication and was instructed to return to the health care unit on the morning of January 10, 2011, to see the site physician

for re-evaluation of her right elbow area. *Id*. The nurse also advised Tramel to "[r]eturn to the HCU for any changes in [her] condition." *Id*. Due to increased pain and swelling in her right arm, Tramel returned to the health care unit at approximately 4:00 a.m. the next morning. *Id*. at 112; *Plaintiff's May 17, 2013 Response - Doc. No. 127* at 6. Tramel was prescribed Tylenol to be taken twice a day for three days and "told to keep follow up appointment with the [doctor] the next day." *Exhibit A to the Special Report of Defendants CMS, Corizon and Hood (Medical Records of Tramel) - Doc. No. 24-2* at 112.

Upon her return to the health care unit on January 10, 2011, Dr. Roe conducted an examination of Tramel's right arm at which time he "stated [the] arm appeared broken [or] dislocated and needed to be x-rayed." *Complaint - Doc. No. 1* at 4. Dr. Roe immediately ordered an x-ray of Tramel's right arm and the x-ray was performed on January 12, 2011, at the Elmore County Hospital. *Id*. He also prescribed Ibuprofen as KOP, i.e., Keep on Person, and a sling for use by Tramel. *Id*. The results of the x-ray indicated "no fracture or dislocation and no radiographically detectable soft tissue abnormality. Normal right forearm. There is no fracture or dislocation and no radiographically detectable soft tissue abnormality. Normal right elbow." *Exhibit A to the Special Report of Defendants CMS, Corizon and Hood (Medical Records of Tramel) - Doc. No. 24-2* at 104; *Complaint - Doc. No. 1* at 4. ("X-ray came back negative for breaks or dislocation."). On January 13, 2011, Dr. Roe conducted a follow-up examination of Tramel regarding pain and immobility in

her right arm. *Exhibit A to the Special Report of Defendants CMS, Corizon and Hood (Medical Records of Tramel) - Doc. No. 24-2* at 35. At this time, Dr. Roe gave Tramel a Cortisone injection which provided "immediate relief of pain but [patient] still had an immobile joint." *Id*. Dr. Roe advised Tramel to "avoid use of her [right] arm except in school." *Id*. He also provided Tramel with a special needs form allowing her to return to school, excusing her from any lifting with the right arm and advising that she "could write if needed." *Id*. at 109. Based on the x-ray report and his examination of Tramel, Dr. Roe submitted a request seeking approval for Tramel to receive a consultation with a free world orthopedist for evaluation of her arm injury. *Id*. at 103.

Dr. Roe again examined Tramel on January 17, 2011, at which time he prescribed Tylenol (Acetaminophen) as KOP, ice/cool compressions at night and advised Tramel she could continue to use the sling as needed. *Id*. at 82, 108. On January 21, 2011, Tramel reported to the health care unit with complaints of severe pain in her right arm and was evaluated by Dr. Roe. *Id*. at 33. Tramel requested a prescription for Ultram (Tramadol), a narcotic-like pain reliever, but Dr. Roe did not deem this medication necessary and, instead, issued a prescription for Naprosyn. *Id*.[3]

On February 10, 2011, Tramel was examined by Dr. Roe at which time "[t]he swelling had almost completely gone away but [she] still had [a loss of] range of motion

[3]Dr. Roe also discontinued the prescription for Ibuprofen.

. . . in [her] right arm" with continuing pain. *Complaint - Doc. No. 1* at 4. Dr. Roe advised Tramel that "CMS has denied [her] being sent to an orthopedic doctor." *Id*. Dr. Roe prescribed Naprosyn for 90 days as KOP and prepared a consultation request in which he sought permission to obtain an MRI of Tramel's right elbow. *Exhibit A to the Special Report of Defendants CMS, Corizon and Hood (Medical Records of Tramel) - Doc. No. 24-2* at 12, 100. This request was approved by the on-site medical director on February 16, 2011, and the regional medical director on February 28, 2011, and the MRI was performed on March 10, 2011. *Id*. at 100; *Complaint - Doc. No. 1* at 4. The MRI indicated "medial soft tissue swelling with signal changes in the proximal fibers of the ulnar collateral ligament, consistent with a partial thickness tear. The remainder of the joint capsule is intact. There is no tendon tear or tendinitis. There is no muscle tear or contusion. There is a contusion of the radial head, but no fracture is seen. Smaller contusions are noted in the olecranon process and in the medial humeral epicondyle. Again, no fractures are identified. The articular surfaces appear smooth. There is a small elbow joint effusion. No loose bodies or periarticular collections are found." *Exhibit A to the Special Report of Defendants CMS, Corizon and Hood (Medical Records of Tramel) - Doc. No. 24-2* at 147; *Complaint - Doc. No. 1* at 4 (Results of the MRI showed "my ulnar collateral ligament had a tear in it . . . contusions and swelling in right elbow region."). The medical records indicate that correctional medical personnel received the MRI results on April 3, 2011.

*Exhibit A to the Special Report of Defendants CMS, Corizon and Hood (Medical Records of Tramel) - Doc. No. 24-2* at 34. At this time, an on-site medical director, Karen A. Flanagan, consulted with Dr. Hood regarding the results of the MRI. Dr. Hood determined that Tramel should be treated with non-steroidal anti-inflammatory medication, warm soaks and physical therapy to increase strength in her arm and gain an increase in the range of motion. *Id*. On April 4, 2011, Dr. Flanagan prepared a request for a physical therapy consultation and spoke with Dr. Hood regarding this request. *Exhibit A to the Response of Defendants CMS, Corizon and Hood - Doc. No. 147* at 4. Dr. Hood verbally approved the request for an off-site physical therapy consultation. *Id*. Medical personnel provided the results of the MRI to Tramel on April 7, 2011, and advised her of the treatment plan directed by Dr. Hood. *Complaint - Doc. No. 1* at 4. Dr. Roe's last involvement with Tramel regarding the injury to her right arm occurred on March 25, 2011 when he issued a special needs form for a bottom bunk profile and no work for 60 days. *Exhibit A to the Special Report of Defendants CMS, Corizon and Hood (Medical Records of Tramel) - Doc. No. 24-2* at 105.[4]

Tramel received out-patient physical therapy on April 13, 2011. *Exhibit A to the Response of Defendants CMS, Corizon and Hood - Doc. No. 147* at 5-8. Although the

---

[4]The last entry in the medical records which references Dr. Roe is on April 27, 2011. However, at this time, Tramel did not seek treatment for her right arm and complained only of scalp/skin problems and menstrual irregularities. *Exhibit A to the Special Report of Defendants CMS, Corizon and Hood (Medical Records of Tramel) - Doc. No. 24-2* at 28.

physical therapist recommended additional therapy sessions, he "instructed [Tramel] in the independent performance of a home exercise program that addresses the problems and achieving the goals outlined in the plan of care" and advised her to individually continue with the therapy program. *Id*. at 7. Tramel attended a follow-appointment with Dr. Flanagan on April 18, 2011. *Complaint - Doc. No. 1* at 4.; *Exhibit A to the Special Report of Defendants CMS, Corizon and Hood (Medical Records of Tramel) - Doc. No. 24-2* at 29-30. Dr. Flanagan discussed the physical therapy session with Tramel and Tramel stated that physical therapy "was painful" and "hurt so bad." *Id*. at 29. Dr. Flanagan spoke with the physical therapist and reviewed Tramel's "records to determine frequency [of possible future] treatment. Advised [patient] will cont[inue] PT for a period of time before considering the need for ortho[pedic] consult." *Id*. On this same date, Dr. Flanagan submitted a consultation request for approval of additional off-site physical therapy for Tramel as she "continues with inability to [fully] extend elbow." *Id*. at 30. Dr. Flanagan also prescribed Ultram (Tramadol) to Tramel. On April 19, 2011, Dr. Hood declined further off-site physical therapy but did "approve one [follow up] onsite Physical Therapy visit [to develop an] exercise program [for Tramel]." *Id*. at 99. Dr. Flanagan advised Tramel of Dr. Hood's decision and an on-site physical therapy session was scheduled for May 3, 2011. *Complaint - Doc. No. 1* at 4; *Exhibit A to the Supplemental Special Report of Defendants CMS, Corizon and Hood (Medical Records of Tramel) - Doc. No. 145-1* at

2-3.

Upon examination of Tramel, the physical therapist made the following objective findings:

> Sensation: intact t/o [throughout the arm].
> Palpation: pain and tenderness to right elbow medial side over Ulnar Collateral Ligament.
> Posture: guarded right upper extremity with patient preferring to keep arm in a sling or when out guard and cradle it.
> PMHx [Patient Medical History]: HC 3, Bipolar, Hep C/A, Alcoholism, Asthma, Cardiac Murmur.
> Special Tests: (+) for strain to Ulnar Collateral Ligament right elbow, grade 1-2.
> Strength: right elbow flex and ext[ension] decreased to 3+/5, shoulder 4/5, wrist/hand 4/5.
> Range of Motion: right elbow flex 105 degrees and extension -15 degrees. Shoulder and wrist/hand WNL's [Within Normal Limits].

*Id*. at 2. The physical therapist also administered the following treatment:

> 1. Manual Therapy: gentle massage to right upper extremity, focused on elbow medial region [followed by] gentle PROM [Passive Range of Motion] and light stretching including wrist and hand.
> 2. Ther[apeutic] Exercise: passive elbow extension stretching techniques that patient can do herself with cuff [weight] (patient can use sock around wrist with weighted objects in sock) around wrist for gravity assisted low load prolonged stretch. Also did . . . standing with elbow propped up on a support. Do in supination, forearm neutral and pronation. Also using wall and table down at waist to position elbow for ext[ension] stretch while using left hand to guide/support position. For elbow flexion, patient again using left hand and apply low load prolonged stretch, using slings Velcro snap to wrap elbow in max flexed attitude and keep there 5-30 minutes for prolonged stretch, leaning against wall with weight of body and elbow flexed. Also can hold onto weighted can or container and carry it around for weighted stretch.
>
> 3. Ther[apeutic] Exercise: light strengthening of elbow overhead triceps

> curls, prone position triceps curls, standing biceps curls, forearm prom/supination; do 1-3 [times] initially and build up to 3-5 [times]. Do 10-20 reps and 2-3 sets for each.
> 4. Home Program: patient given home program handout for all these ex[ercises] and is to do daily and pepper in [throughout] the day. She is to wean out of sling and stop wearing completely within a week or two.

*Id*.

The physical therapist concluded his report with an assessment of Tramel's condition and prognosis which reads as follows:

> [Patient] presents with chronic elbow pain and guarding due to ulnar collateral ligament strain, mild to moderate. She has gotten in to the habit of overly guarding it, consequently, she has also lost elbow flexibility and range of motion, has ongoing tenderness and weakness. She has to be self initiated to break herself out of these patterns. ***With the above home program she can do it and elbow has a good chance of resolvement with diligent home program follow through daily***.

*Id*. (emphasis added). It is clear from the foregoing that the physical therapist determined Tramel's "habit of overly guarding" her right elbow had caused her to lose "elbow flexibility and range of motion" but determined these issues could be resolved if Tramel followed the home exercise program designed for her. *Id*.

On May 9, 2011, Tramel reported to the health care unit for a follow up appointment with Dr. Flanagan regarding her right arm problems and complaints of pain. Tramel presented with her right arm in a sling and advised Dr. Flanagan that she had "over extended self . . . pushed self too far" when doing physical therapy and had tried to explain her concerns "to [the physical] therapist." *Exhibit A to the Special Report of Defendants*

*CMS, Corizon and Hood (Medical Records of Tramel) - Doc. No. 24-2* at 27. Tramel stated her opinion that her range of motion had not improved and advised her pain was at a level of 6 on a scale of 10. *Id.* Dr. Flanagan instructed Tramel to continue the physical therapy exercises in accordance with the written instructions contained in the handout provided to her by the physical therapist. *Id*. at 25.

Tramel returned to the health care unit on June 1, 2011 to review the status of her right arm injury with Dr. Flanagan. Tramel advised that the Ultram prescribed to her caused nausea and she was doing physical therapy but had made "no progress" and could not "extend [her arm] beyond 75°" which Dr. Flanagan observed was the level of extension during this examination. *Id*. Tramel "state[d] pain [in] elbow area [occurred] when doing exercises and pain through to wrist." *Id*. Based on this examination, Dr. Flanagan discontinued Tramel's prescription for Ultram and submitted a request for approval of an orthopedic consultation for evaluation of Tramel's right arm as Tramel had failed to regain full function and was "unable to extend beyond 120°." *Id*. at 97. Tramel also received a special needs form permitting use of a bottom bunk for 90 days and ordering no work for 30 days. *Id*. at 117.

On June 6, 2011, Dr. Hood denied the request for an orthopedic consultation and issued an Alternative Treatment Plan requiring that Tramel's condition be "[m]anage[d] on site." *Id*. at 97. Dr. Flanagan next examined Tramel on June 28, 2011, and informed

her that Dr. Hood had denied the request for an orthopedic consultation. *Id*. at 23. Dr. Flanagan "encouraged Tramel to do ROM [and] strengthening exercises" in accordance with the instructions of the physical therapist. *Id*. Dr. Flanagan "noted [that Tramel did] not have sling on and did close door with right hand." *Id*. at 24. Dr. Flanagan issued a special needs form allowing Tramel to refuse work and/or school for 90 days, providing her use of a bottom bunk for 90 days and requiring no lifting of more than 5 pounds for 30 days. *Id*. at 118.

On July 8, 2011, Dr. Flanagan and Dr. Hood undertook an evaluation of Tramel to assess the condition of her right elbow. *Id.* at 22. Dr. Hood tested the range of motion in Tramel's right elbow and conducted a physical palpation of her arm. *Id*. Dr. Hood ordered an additional x-ray of Tramel's right arm/elbow and advised Tramel "that at this time" neither an orthopedic consult nor an elective surgical procedure were "indicated [as she] can do ADL [- activities of daily life]" and her range of motion was not at a significantly decreased level. *Id*. The x-ray was performed on July 12, 2011 and demonstrated "no fracture, dislocation or bony reaction of the right elbow. . . . Normal right elbow." *Id*. at 127. During a subsequent examination of Tramel on August 1, 2011, Dr. Flanagan observed that Tramel "does move hand & arm [when] expressing self." *Id*. at 21. Dr. Flanagan scheduled Tramel for reassessment in 30 days. *Id*. at 19.

On August 30, 2011, Dr. Flanagan examined Tramel. During this examination,

Tramel complained of burning in her right arm and tenderness in the elbow area. *Id*. at 19-20. Dr. Flanagan found "no acute tenderness or induration. Moves arm [with] mild restriction of shoulder." *Id*. at 20. Thus, no treatment was ordered and Tramel was advised that Dr. Flanagan would reassess her condition in two weeks. The follow-up appointment occurred on September 14, 2011 at which time Dr. Flanagan noted that the burning in Tramel's right "elbow has resolved and [there is] less tightness" although Tramel alleged to have some pain with movement of the arm. *Id*. at 18. This examination demonstrated "improved [extension and] movement of elbow [but patient] cannot fully extend" her arm. *Id*. Dr. Flanagan instructed Tramel to seek additional treatment as needed and advised her that she could continue welding. *Id*. at 17-18.

On October 12, 2011, Dr. Flanagan conducted a follow-up examination of Tramel at which time it was noted that Tramel was "able to perform duties" although she did not yet have full range of motion and suffered pain at times in areas of her arm. *Id*. at 17. Dr. Flanagan advised Tramel she could "cont[inue] full activity" and should return for her next evaluation in 3 months. *Id*. at 16. Per Dr. Flanagan's instructions, Tramel returned to the health care unit on January 12, 2012 for evaluation of her right arm. Dr. Flanagan observed that the "the extension of elbow and strength [of right arm are both] improved." Dr. Flanagan prescribed a muscle rub for Tramel to use on her arm. *Id*. at 7.

Initially, a review of the complaint establishes that the claims lodged against Dr.

Roe entitle Tramel to no relief as it is clear he did not act with deliberate indifference to Tramel's right arm injury. Dr. Roe first examined Tramel on January 10, 2011, two days after she suffered the injury. *Complaint - Doc. No. 1* at 4. Due to the amount of swelling he observed and the pain reported by Tramel, Dr. Roe ordered an x-ray of her arm, issued a sling for Tramel's use in immobilizing her arm to prevent additional injury and prescribed medication to Tramel. The x-ray was conducted on January 12, 2012, a short delay which in no way adversely impacted the treatment provided to Tramel or worsened her injury. Upon receipt of the x-ray report, Dr. Roe submitted a request form seeking an orthopedic consultation for evaluation of Tramel's arm injury but his request was denied. *Id*. at 4. Dr. Roe routinely examined Tramel for complaints related to her right arm and continued to provide treatment for her injury, including provision of medication to alleviate pain and/or swelling, the issuance of special needs profiles, seeking an orthopedic consultation, and requesting and gaining approval for an MRI. *Id*. The actions of Dr. Roe as set forth by Tramel fail to implicate deliberate indifference or callous disregard by this defendant. Consequently, the claims against Dr. Roe provide no basis for relief and are due to be dismissed.

The essence of the claims regarding medical treatment are addressed to the actions of CMS, Corizon and Dr. Hood. Specifically, Tramel argues that the aforementioned defendants undertook a conservative course of treatment for her elbow injury and that such

constituted deliberate indifference as it was "an easy, less efficacious means of treatment than appropriate." *Id*. In support of this claim, Tramel asserts that the defendants should have approved an orthopedic consultation and authorized additional physical therapy sessions under the care of a physical therapist.

Defendants CMS, Corizon and Hood adamantly deny they acted with deliberate indifference to Tramel's arm injury. In support of this assertion, these defendants maintain that medical treatment was provided to Tramel in accordance with the professional judgment of Dr. Hood which he based on common standards for treatment of an injury such as the one suffered by Tramel, i.e. initial stabilization of injured area, application of cold compressions to the area, physical therapy, and medication to alleviate pain and swelling.

The affidavit filed by Dr. Hood addresses the claims made by Tramel alleging the denial of adequate medical treatment. A thorough review of the evidentiary materials filed in this case demonstrates that this affidavit, in relevant part, is corroborated by the objective medical records compiled contemporaneously with treatment provided to Tramel relative to the instant claim of deliberate indifference. The pertinent portion of Dr. Hood's affidavit reads as follows:

> In my role as Associate Regional Medical Director, I am not assigned responsibilities for any one single correctional facility. The overall clinical management for each facility is assigned to a physician who holds the position of "medical director." As the Associate Regional Medical Director, I am generally responsible for supervising and providing support to the clinicians throughout the correctional facilities in Alabama in which Corizon

is currently providing medical services. For example, I routinely examine individual inmates at various correctional facilities upon the request of the medical director for each such institution for the purposes of providing a second opinion related to various complex, uncertain or particularly difficult conditions and/or treatment options.

Over the course of the last six (6) months, I have visited Tutwiler Prison for Women ("Tutwiler") on a regular basis to provide assistance and additional guidance and insight to the medical director assigned to this facility. In many instances, I am asked to provide second opinions to the Tutwiler medical director. Within the last sixty (60) days, I traveled to Tutwiler for one of these regular visits to provide assistance to the facility's medical director. At this time, I do not recall the exact date, but I do recall seeing a patient by the name of Lela Tramel ("Ms. Tramel") who complained of discomfort associated with her right elbow.

At the time I examined Ms. Tramel, she informed me that she injured her elbow during an altercation with members of the Tutwiler correctional staff [during which she maintains officers used excessive force against her]. I reviewed the prior imaging studies of her elbow which were included in Ms. Tramel's medical records and noted that she had not experienced any fracture [or] dislocation . . . to her elbow. I also conducted a physical examination of Ms. Tramel. Through this physical examination, I did not see any bruising or other notable injuries to Ms. Tramel's right elbow. Ms. Tramel essentially complained to me that her right elbow was not "fixed." Additionally, I did not find any significant limitation in Ms. Tramel's range of motion with her right elbow. At most, Ms. Tramel demonstrated a five percent (5%) deficit in her range of motion with her right elbow. By virtue of my physical examination of Ms. Tramel, a review of certain portions of Ms. Tramel's medical records and my conversation with the site medical director, it was my professional opinion that Ms. Tramel . . . experienced a soft tissue injury to her elbow.

Considering that Ms. Tramel had previously received some physical therapy [both during appointments with physical therapists and in accordance with instructions to continue therapy via a home exercise plan tailored to her needs], I did not believe that further physical therapy could be medically justified. It is also important to note that, in my experience, the effectiveness of physical therapy is dependent almost entirely upon the compliance and diligence of the patient. Moreover, physical therapy cannot always eliminate range of motion deficits in a patient's joints after a soft tissue injury, such as

the injury Ms. Tramel . . . sustained to her elbow. Having referred patients to orthopedic specialists throughout my medical career, I firmly believe that an orthopedic specialist would not recommend any surgical intervention or other medical treatment for Ms. Tramel, given the substantial risks associated with any such treatment to correct [the] minor limitations in her range of motion. If Ms. Tramel continues to utilize her right arm and follow the exercise regimen provided to her by the physical therapist, she may, in fact, see some additional improvement in her range of motion.

Prior to this most recent examination [of this inmate], I also saw Ms. Tramel on July 8, 2011, with the site medical director. As indicated in the site medical director's notes, we . . . examined Ms. Tramel's condition on this occasion. The condition of Ms. Tramel's [right arm] was not markedly different from my findings during the more recent examination. . . . Ms. Tramel indicated some minor limitation in her range of motion, but no surgical or other orthopedic intervention was indicated based upon her condition and I specifically informed her of this observation during the course of the July 8, 2011, appointment. In other words, this July 8, 2011, examination confirmed that Ms. Tramel would not, in my judgment, benefit from consultation with an orthopedic specialist.

. . . [M]y review of [Ms. Tramel's] medical records [makes it apparent] that she received timely, appropriate and comprehensive care after her . . . injury to her right elbow. . . .

On January 8, 2011, at approximately 8 a.m., the medical staff examined Ms. Tramel at the request of the Alabama Department of Corrections. At that time, the medical staff noted swelling to Ms. Tramel's right elbow, which was described as a "possible sprain." Ms. Tramel refused any pain medication at that time and was instructed to return to the health care unit if she experienced an "increased pain and swelling." At the conclusion of this appointment, Ms. Tramel received an ace wrap and an ice compress intended to alleviate the swelling in her right elbow. [It is undisputed that Ms. Tramel returned to the health care unit the next morning complaining of pain and swelling for which she received Tylenol and was advised to return the health care unit the next day for examination by the site physician. Tramel was examined by Dr. Roe on January 10, 2011. At this time, Dr. Roe prescribed Ibuprofen and ordered an x-ray of Tramel's arm.] [The] x-ray of Ms. Tramel's right elbow on January 12, 2011, was "normal," and did not indicate any fracture or dislocation. . . .

Over a week after undergoing this x-ray, Ms. Tramel submitted a sick

call request form dated January 20, 2011, complaining of "severe pain in right arm," and requested pain medication. She was evaluated by the Tutwiler medical staff during sick call the following day. Later on the morning of January 21, 2011, Ms. Tramel saw the nurse practitioner at Tutwiler who discontinued her prescription for Ibuprofen and prescribed the non-steroidal anti-inflammatory medication, Naprosyn (also known as "Naproxen"). . . . As indicated in [the medical records], the medical staff timely responded to each of Ms. Tramel's complaints and requests for evaluation.

Between January, 2011 and January, 2012, the site medical director and [a site physician] saw Ms. Tramel on approximately twenty (20) different occasions related to her complaints of elbow discomfort. . . .

Ms. Tramel underwent multiple x-rays of her right arm (including x-rays taken on January 12, 2011 and July 12, 2011), all of which were "normal." Magnetic resonance imaging ("MRI") of Ms. Tramel's right elbow conducted in March of 2011 confirmed that Ms. Tramel had not suffered any fracture in her elbow. The MRI did mention a small tear in the [proximal fibers of the] ulnar collateral ligament and some soft tissue swelling, which is indicative of the soft tissue type injury mentioned above. This condition is commonly treated with non-steroidal anti-inflammatory medication and limited physical therapy, which is exactly what Ms. Tramel received.

Ms. Tramel also received orders from the medical staff at Tutwiler allowing her to utilize a bottom bunk and to be excused from any work obligations. As recently as January 12, 2012, Ms. Tramel received a topical muscle cream for her arm to alleviate discomfort and muscular tension in her arm.

* * *

Ms. Tramel does not currently require any specific off-site specialty consultation of any kind or any further medical treatment of any kind regarding her elbow. In the normal course of the operations of the health care unit at Tutwiler, the site medical director is regularly called upon to provide all of the medical care which Ms. Tramel currently requires. I can state to a reasonable degree of medical certainty that Ms. Tramel is not currently in imminent (or even remote) danger of serious physical injury or harm as a result of any decision, act or omission on the part of the medical staff at Tutwiler. I along with the other members of the medical staff have not refused to provide Ms. Tramel with any necessary medical care. As

> evident from her medical records, Ms. Tramel's complaints were not ignored. In fact, on each occasion that Ms. Tramel voiced concerns or complaints to the medical staff, the medical staff endeavored to provide a timely evaluation and/or consultation. Based upon my evaluations of Ms. Tramel and my view of her medical records, I can also state to a reasonable degree of medical certainty that Ms. Tramel has received an appropriate, necessary and timely course of treatment during her incarceration at Tutwiler.

*Exhibit D to the Special Report of Defendants CMS, Corizon and Hood - Doc. No. 24-4* at 1-6 (paragraph numbering and internal citations to medical records omitted).

Under the circumstances of this case, the court concludes that the course of treatment undertaken by Dr. Hood in addressing Tramel's arm injury did not violate her constitutional rights. The medical care Tramel received was certainly not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to the fundamental fairness." *Harris*, 941 F.2d at 1505. The allegations presented by Tramel simply fail to establish deliberate indifference by CMS, Corizon or Dr. Hood. *Taylor*, 221 F.3d at 1258 ("[M]erely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law" does not amount to deliberate indifference.); *Adams*, 61 F.3d at 1545-46 (Whether medical personnel "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis" on which to ground constitutional liability. In addition, an inmate's allegation that prison physicians did not diligently pursue alternative means of treating condition "did not 'rise beyond negligence'.

. . to the level of deliberate indifference."); *Garvin*, 236 F.3d at 898 (difference of opinion regarding manner in which condition should be treated fails to demonstrate a constitutional violation); *Hamm*, 774 F.2d at 1505 (inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment); *Farmer*, 511 U.S. at 838 (A defendant's "failure to alleviate significant risk that he should have perceived but did not" fails to establish deliberate indifference.).

It is undisputed that Tramel received medical care for her injury. It is likewise evident that treatment was provided to Tramel in accordance with the professional judgment of Dr. Hood. Moreover, Tramel has failed to present any evidence which indicates defendants CMS, Corizon or Hood knew that the manner in which they provided treatment created a substantial risk to Tramel's health and that with this knowledge consciously disregarded such risk. The record is therefore devoid of evidence, significantly probative or otherwise, showing that defendants CMS, Corizon and Dr. Hood acted with deliberate indifference to Tramel's medical needs. Consequently, summary judgment is due to be granted in favor of defendants CMS, Corizon and Hood. *Carter*, 352 F.3d at 1350.

**D. Excessive Force**

Claims of excessive force by prison officials against convicted inmates are governed by the Eighth Amendment's proscription against cruel and unusual punishment. *Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999). The standard applied to an Eighth Amendment excessive force claim contains both a subjective and objective component. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). The subjective component requires that prison "officials act[ed] with a sufficiently culpable state of mind." *Hudson*, 503 U.S. at 8 (internal quotations omitted). With respect to the objective component, a plaintiff must show that "the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Id*. In addition, "the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury." *Id*. at 4. "Injury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose [her] ability to pursue an excessive force claim merely because [she] has the good fortune to escape without serious injury." *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010).

> Under the Eighth Amendment, force is deemed legitimate in a custodial setting as long as it is applied "in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm." *Whitley v. Albers*, 475 U.S. 312, 320-21, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)); *see also Hudson v. McMillian*, 503 U.S. 1, 8, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992). To determine if an application of force was applied maliciously and sadistically to cause harm, a variety of factors are considered including: "the

> need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Hudson*, at 7-8, 112 S. Ct. 995; *see also Whitley*, 475 U.S. at 321, 106 S. Ct. 1078; *Harris v. Chapman*, 97 F.3d 499, 505 (11th Cir. 1996). From consideration of such factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley*, 475 U.S. at 321, 106 S. Ct. 1078 (quoting *Johnson*, 481 F.2d at 1033).

*Skrtich*, 280 F.3d at 1300-01; *Johnson v. Breeden*, 280 F.3d 1308, 1321 (11th Cir. 2002) (The standard applied to an Eighth Amendment excessive force claim is whether the challenged use of force was applied "in a good faith effort to maintain or restore discipline" or instead "maliciously and sadistically for the very purpose of causing harm."); *Campbell*, 169 F.3d at 1374 ("To establish an Eighth Amendment claim for excessive force, . . . Plaintiff must meet [a heightened] intent requirement . . . [and] must prove that 'force was applied . . . maliciously and sadistically for the very purpose of causing harm.' *Whitley*, 475 U.S. at 320-21, 106 S. Ct. 1078 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973). . . . [F]orce does not violate the Eighth Amendment merely because it is unreasonable or unnecessary."). In addition, "a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives" is not enough to support a claim of excessive force in a prison setting. *Campbell*, 169 F.3d at 1375.

The law is likewise well settled that:

> [N]ot . . . every malevolent touch by a prison guard gives rise to a federal

> cause of action. *See Johnson v. Glick*, 481 F.2d, at 1033 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights"). The Eighth Amendment's prohibition of "cruel and unusual" punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort "'repugnant to the conscience of mankind.'" *Whitley*, 475 U.S. at 27, 106 S.Ct. at 1088. . . .

*Hudson*, 503 U.S. at 9-10. When considering a claim of excessive force, this court must give "a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of a disturbance." *Fennell v. Gilstrap*, 559 F.3d 1212, 1217 (11th Cir. 2009) (per curiam) (internal quotation marks omitted). A relevant factor in ascertaining whether correctional officers used force in a malicious and sadistic manner is the extent of the injury suffered by the inmate. *Skrtich*, 280 F.3d at 1302; *Campbell*, 169 F.3d at 1375.

> "When prison officials maliciously and sadistically use force to cause harm," the Court recognized, "contemporary standards of decency always are violated . . . whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." *Hudson*, 503 U.S. at 9, 112 S.Ct. at 995.

*Wilkins*, 559 U.S. at 38. Thus, in an excessive force case such as the one at hand, "the 'core judicial inquiry' is 'not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Bowden v. Stokely*, 576 F. App'x 951, 953 (11th Cir. 2014) (quoting *Wilkins*, 559 U.S. at 37) (quotation marks omitted) (concluding

that a gratuitous beating by prison guards, even without injuries requiring medical attention, violated a prisoner's Eighth Amendment rights)); *Stallworth v. Tyson*, 578 F. App'x 948, 953 (11th Cir. 2014) (internal citations omitted) ("Although the extent of injury is a relevant factor in determining whether the use of force could plausibly have been thought necessary under the circumstances and may be an indication of the amount of force applied, it is not solely determinative of an Eighth Amendment claim. Instead, the focus of the Eighth Amendment inquiry is on the nature of the force applied, rather than the extent of injury inflicted."); *Vicks v. Knight*, 380 F. App'x 847, 851 (11th Cir. 2010) ("In determining whether the amount of force used against an inmate was *de minimis*, a court may consider the extent of the injuries suffered by the inmate. *Skrtich*, 280 F.3d at 1302. Nevertheless, a court ultimately should decide an excessive force claim 'based on the nature of the force rather than the extent of the injury.' *Wilkins v. Gaddy*, 559 U.S. 34, [37], 130 S. Ct. 1175, 1177, 175 L. Ed. 2d 995 (2010).").

1. <u>Karla Jones</u>. Tramel alleges that on January 21, 2011, defendant Jones "snatched on my left arm" in an effort to have her respond more quickly to an order. *Complaint - Doc. No. 1* at 5; *Memorandum in Opposition to Special Report of Correctional Defendants - Doc. No. 36* at 12. Tramel does not allege any physical injury based on this use of force.

After a thorough review of the facts and viewing such in a light most favorable to Tramel, the court concludes that challenged use of force by defendant Jones is, at best, a

"*de minimis* use[] of physical force" which is excluded from "[t]he Eighth Amendment's prohibition of 'cruel and unusual' punishments" as such contact "is not of a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 9-10; *Sepulveda v. Burnside*, 170 F. App'x 119, 124 (11th Cir. 2006) (claim that officer "jerked [inmate] by the ankle while checking his leg shackles . . . [did] not rise to the level of a constitutional violation."); *Hall v. Santa Rosa Corr. Instit.*, 403 F. App'x 479, 482 (11th Cir. 2010) (officers who forced inmate's hands behind his back to apply handcuffs after inmate refused orders and became combative "did not use unconstitutional excessive force [and] no constitutional violation occurred."); *McCall v. Crosthwait*, 336 F. App'x 871, 872 (11th Cir. 2009) (no constitutional violation occurred where officer pushed detainee out of jail's elevator causing inmate to hit partially open steel door and fall against plexiglass window thereby suffering bruised shoulder and elbow); *Johnson v. Moody*, 206 F. App'x 880, 885 (11th Cir. 2006) (minor nature of injury suggested that officer's pushing or kicking metal tray door on inmate's hand was *de minimis* use of force which did not constitute Eighth Amendment violation); *Anderson v. Sullivan*, 702 F. Supp. 424, 427 (S.D.N.Y. 1988) (officers who pushed prisoner into a bar and put his hands behind his back to apply handcuffs did not administer excessive force). Summary judgment is therefore due to be granted in favor of defendant Jones.

2. <u>Samuel Foster</u>. Tramel contends that on January 8, 2011 at approximately 7:45

a.m., defendant Foster subjected her to unnecessary and excessive acts of force. *Complaint - Doc. No. 1* at 3.

(i) Qualified Immunity. With respect to Tramel's excessive force claim against defendant Foster in his individual capacity, the correctional defendants argue that Foster is entitled to qualified immunity.

> Under the doctrine of qualified immunity, if the defendant establishes that he was acting within the scope of his discretionary authority when the alleged excessive force occurred, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity. *Skop* [*v. City of Atlanta*, 485 F.3d 1130, 1136-37 (11th Cir. 2007)]. To defeat qualified immunity, a plaintiff must show both that a constitutional violation occurred and that the constitutional right violated was clearly established. *Fennell* [*v. Gilstrap*, 559 F.3d 1212, 1216 (11th Cir. 2009) (per curiam)]. In Eighth Amendment excessive force cases, however, "the subjective element required to establish [the constitutional violation] is so extreme that every conceivable set of circumstances in which this constitutional violation occurs is clearly established to be a violation of the Constitution." *Johnson v. Breeden,* 280 F.3d 1308, 1321-22 (11th Cir. 2002).

*Bowden*, 576 F. App'x at 954-55. "While . . . there is no per se rule barring qualified immunity in Eighth Amendment cases, where the plaintiff has sufficiently alleged or shown a material dispute of fact as to an excessive force claim, summary judgment based on qualified immunity is not appropriate." *Bowden*, 576 F. App'x at 956 (citing *Skrtich*, 280 F.3d at 1301). Accordingly, this court will consider whether the plaintiff's allegations that Foster maliciously and sadistically used excessive force against her, which the court must take as true for purposes of summary judgment, sets forth a violation of her Eighth

Amendment rights.

(ii) The Use of Force. Tramel asserts that on the morning of January 8, 2011,

> Foster isolated me from other inmates by forcefully taking me outside alone between annex buildings. Once outside, while not resisting, he slammed me against side of [the] building and began choking me with his forearm to my throat. . . . While still being choked and nearly unconscious, C.O. Wilson ran up and grabbed my right wrist. Foster and Wilson turned me around. Foster pinned me against the wall face first, still not resisting, Wilson held my arm straight and applied pressure to my elbow area until it popped.

*Complaint - Doc. No. 1* at 3; *Memorandum in Opposition to Special Report of Correctional Defendants - Doc. No. 36* at 5-6 (While escorting Tramel from the day area of the dorm "Foster . . . grabbed Tramel's left shoulder and pulled her with such force [that] she came out of her slides. . . . [He] forcefully took her outside alone between [the dorms] . . . of the annex isolating her from the other inmates. . . . Foster was . . . angered [by Tramel's suggestion that he release his hold on her] and rushed Tramel off the side walk towards the side of dorm N and then slammed her in to it. From there he proceeded to take his left arm across her throat and began choking her to near unconsciousness. . . . [T]he only movement Tramel made during the entire attacked [occurred when she turned her head to the left and attempted to lower her chin to alleviate the pressure of Foster's choke hold]. . . . Wilson exited dorm N and rushed up on the scene. Standing to the left of her, Wilson reached between Foster and Tramel. Grabbing her by the right wrist, as Foster was removing his forearm from Tramel's throat. [The officers] got her turned

around so she was now facing the wall. Foster held her pinned to the wall . . . and Wilson then held her right arm extended out straight to the side . . . and applied serious amounts of pressure to her elbow region . . . [until] the elbow region made a loud popping sound.").

Tramel was transported to the health care unit for treatment. The attending nurse noted "swelling to [Tramel's right] elbow area outer aspect." *Exhibit A to the Special Report of Defendants CMS, Corizon and Hood (Medical Records of Tramel) - Doc. No. 24-2* at 42. The nurse also observed a small contusion to Tramel's right big toe and a small laceration to her left chin area. *Id*. A subsequent MRI indicated that Tramel suffered a "[p]artial tear of the proximal fibers of the ulnar collateral ligament" as a result of the force utilized against her. *Id*.

Defendant Foster denies Tramel's claim regarding the use of excessive force. Specifically, Foster maintains that on the morning of January 8, 2011 he went

> to assist Officer Brian Wilson with counseling inmate Lela Tramel . . . due to inmate Tramel being insubordinate towards Officer Wilson regarding inmate Tramel's personal property that was left in [the] day room area. I attempted on several occasion[s] to speak with inmate Tramel, but inmate Tramel became belligerent. . . . I then grasped inmate Tramel by the left sleeve of [her] shirt in an attempt to escort inmate Tramel to the Administrative Building so that inmate Tramel could be counseled by the Shift Commander. . . . [I]nmate Tramel became combative and reached for my state issued radio and keyed the microphone causing a small laceration to my left forearm. Once inmate Tramel reached for the radio, I then held inmate Tramel against the wall outside of Dormitory N with my right hand as I radioed for the Shift Commander, Lieutenant Sherry Ferrell for assistance. Inmate Tramel alleges that I slammed her . . . against the wall . . . and choked her, but this is not true.

*Exhibit B to the Special Report of Defendants Jones and Foster - Doc. No. 30-2* at 1-2.

Even though defendant Foster disputes the version of events presented by Tramel, the court is required at this stage of the proceedings to view the facts in the light most favorable to Tramel and draw all reasonable inferences from those facts in her favor. *Bradley v. Franklin Collection Serv., Inc.*, 739 F.3d 606, 608 (11th Cir. 2014). In that vein, Tramel provides that defendant Foster slammed her against the wall and choked her without provocation and while she posed no threat to Foster or the security of the facility. Finally, Tramel asserts that the challenged actions resulted in injuries to various areas of her body.

As previously set forth, defendant Foster denies Tramel's allegations regarding the use of excessive force and maintains that at no time during the incident was more force used than necessary to subdue and gain control of Tramel after she became insubordinate and combative. Nevertheless, viewing the facts in the light most favorable to Tramel, the court concludes that defendant Foster is not entitled to qualified immunity as the plaintiff has alleged facts sufficient to survive his motion for summary judgment regarding the excessive force claim lodged against him. *Skrtich*, 280 F.3d at 1301. Specifically, disputed issues of material fact exist regarding the need for the use of force, the nature of the force used and whether the defendant acted "maliciously and sadistically" to cause harm. Consequently, the motion for summary judgment with respect to the claim of

excessive force lodged against defendant Foster in various capacities is due to be denied.

## IV. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. The plaintiff's claims against Dr. Roe be DISMISSED with prejudice.

2. The motion for summary judgment filed by defendants CMS, Corizon and Hugh Hood be GRANTED.

3. The motion for summary judgment filed on behalf of defendants Karla Jones and Samuel Foster with respect to the plaintiff's claims for monetary damages lodged against them in their official capacities be GRANTED and these claims be DISMISSED with prejudice as defendants Jones and Foster are entitled to absolute immunity from these claims.

4. The motion for summary judgment filed by defendant Karla Jones regarding all claims presented against this defendant in the remaining aspects of her official capacity and in all aspects of her individual capacity be GRANTED.

5. The motion for summary judgment filed on behalf of defendant Samuel Foster with respect to the plaintiff's excessive force claim lodged against him in his official capacity seeking relief other than monetary damages and in all aspects of his individual capacity be DENIED.

6. All claims, with the exception of the plaintiff's surviving excessive force claim

against defendant Samuel Foster, be DISMISSED with prejudice.

7. This case be set for a set for an evidentiary hearing before the undersigned on the plaintiff's claim of excessive force claim lodged against defendant Samuel Foster.

It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before **March 4, 2015**. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive, or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); s*ee Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); s*ee also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

Done this 18th day of February, 2015.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE